UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

UNITED STATES OF AMERICA,

          v.

JULIAN GONZALEZ,

          Defendant.

------------------------------------------------------------------X

**MEMORANDUM AND ORDER**
23-CR-179 (WFK) (RML)

**WILLIAM F. KUNTZ, II, United States District Judge:**

On October 18, 2024, a unanimous jury found Julian Gonzalez ("Defendant") guilty of attempted obstruction of justice in violation of 18 U.S.C. § 1512(c)(1). Verdict Sheet at 1, ECF No. 87.[1] The Court now sentences Defendant and provides a complete statement of reasons, under 18 U.S.C. § 3553(c), of those factors set forth by Congress in 18 U.S.C. § 3553(a). For the reasons set forth below, Defendant is hereby sentenced to fifty-seven (57) months' incarceration; two (2) years of supervised release with both the standard conditions and special condition of supervision; and a $100.00 mandatory special assessment.

## I.    Background

### A.    Factual Background

On March 17, 2023, Defendant attempted to destroy a cellphone containing evidence of his involvement in a conspiracy to distribute—and his actual distribution of—cocaine. Presentence Investigation Report (the "PSR") ¶¶ 6–9, 13–14, ECF No. 126.

### 1.    *The Uncharged Conduct*

In 2022, the Federal Bureau of Investigation (the "FBI") discovered Defendant's involvement "in the distribution of controlled substances, specifically, violations of 21 U.S.C. § 841 (i.e., Narcotics Distribution) and 21 U.S.C. § 846 (i.e., Conspiracy to Distribute Narcotics)"

---

[1] Citations are to the docket in *United States v. Gonzalez*, 23-CR-179. Page pincites refer to the ECF page numbers assigned to a filing, where available, and where no ECF heading is present, to the page numbers listed in the original filing.

(the "Uncharged Conduct"). *Id.* ¶ 6. On October 5, 2022, Defendant met with an individual ("Individual-1") at Defendant's apartment. *Id.* ¶ 7. At this meeting, Defendant gave Individual-1 a 1.0079-kilogram package of cocaine and directed Individual-1 to sell it on a consignment basis. *Id.* Individual-1 was expected to pay Defendant approximately $20,000.00 for this cocaine. *Id.* The FBI subsequently acquired the package, tested it, and found the drugs had a purity level of 74%, resulting in a net cocaine weight of 0.746 kilograms. *Id.*

Ten days later, on October 15, 2022, Defendant and Individual-1 met again. *Id.* ¶ 8. At this meeting, Individual-1 gave Defendant $10,000.00 as a partial payment for the October 5th cocaine package and informed Defendant of two other co-conspirators Individual-1 could introduce to Defendant for the purpose of facilitating additional drug transactions. *Id.*

On October 29, 2022, Defendant messaged Individual-1 on an encrypted digital messaging application called Signal. *Id.* Defendant's message told Individual-1 he needed to "close out the tab," i.e., pay Defendant the remaining balance for the October 5th cocaine package. *Id.*

On November 2, 2022, Defendant and Individual-1 met again at the same location as their October 15th meeting. *Id.* ¶ 9. At this meeting, Individual-1 gave Defendant $10,000.00 as another partial payment for the cocaine package. *Id.* Defendant asked Individual-1 if he was interested in purchasing additional kilograms of cocaine. *Id.*

On November 16, 2022, Defendant and Individual-1 met again. *Id.* At this meeting, Individual-1 made a final payment for the October 5th cocaine package in the amount of $2,000.00 and they continued discussing potential drug transactions. *Id.* Defendant "[told] Individual-1, among other things, that he needed an additional supply of cocaine, because he had recently received an order to sell 10 kilograms of cocaine but only had four kilograms of cocaine

2

available to sell." *Id.* Thereafter, Defendant and Individual-1 continued to discuss narcotics distribution via cellphone. *Id.*

At some point, Defendant asked Individual-1 to arrange for one of Individual-1's aforementioned co-conspirators to purchase cocaine from Defendant. *Id.* In February 2023, Defendant messaged Individual-1 on Signal, relaying his ability to sell the co-conspirator two kilograms of cocaine per month for $21,000.00 per kilogram. *Id.* On March 10, 2023, Defendant again messaged Individual-1 on Signal and complained "that [the co-conspirator] had not paid him in full for a kilogram of cocaine that he had provided[.]" *Id.*

To date, Defendant has not been charged for his involvement in the Uncharged Conduct. *Id.* ¶ 6 n.1; Gov't Sent'g Mem. at 1 n.1, ECF No. 130.

### 2. The Instant Offense

During the FBI's investigation into Defendant, law enforcement suspected Defendant's cellphone (the "Phone") contained evidence of the Uncharged Conduct since September 2022. *Id.* ¶ 6.

On March 14, 2023, Defendant flew to Mexico which presented law enforcement the opportunity to intercept Defendant and the Phone upon his return to the United States. *Id.* ¶ 10. Law enforcement anticipated Defendant would board a return flight to John F. Kennedy International Airport ("JFK") on March 17, 2023. *Id.* On March 17th, Defendant's anticipated day of arrival, law enforcement obtained a judicial search warrant to seize the Phone and search it for evidence of the Uncharged Conduct. *Id.* ¶ 11. The FBI coordinated with U.S. Customs and Border Protection ("CBP") officers to execute the warrant at JFK. *Id.*

As anticipated, Defendant landed at JFK at approximately 8:45 P.M. on March 17, 2023. *Id.* ¶ 12. Shortly thereafter, CBP officers escorted Defendant to a private area for a secondary

3

inspection. *Id.* ¶ 13. Officers patted down Defendant and found $5,600.00 in cash in his possession. *Id.* During this time, Defendant received a call on the Phone which he answered and hung up briefly. *Id.*

FBI agents then entered the private area and executed the search warrant. *Id.* The FBI "provided [Defendant] with a copy of the [s]earch [w]arrant, which he took his time to read and, ultimately [Defendant] became aware that he was under investigation for drug trafficking." *Id.* Defendant then unlocked the Phone and gave it to the FBI agents. *Id.* The FBI agents did not observe any damage to the Phone and put it in airplane mode, preventing any incoming calls or messages. *Id.* They then began looking through the Phone and photographed what they found, such as messages about drugs. *Id.* "A preliminary search of the Phone's Signal application revealed text messages, dating back as far as 2022, between [Defendant] and other individuals, discussing a potential purchase of marijuana and a separate purchase for one kilogram of cocaine (for approximately $20,000)." *Id.*

Shortly after handing the Phone to the FBI agents, Defendant asked to use the Phone to call his wife, whose number he claimed he did not remember. *Id.* ¶ 14. However, when the FBI agents handed Defendant the Phone, he "slammed the Phone on the ground and moved aggressively towards the Phone, as if intending to step on it." *Id.* CBP officers and the FBI agents then restrained Defendant to prevent further damage to the Phone. *Id.*

The Phone sustained "significant damage." *Id.* Law enforcement was "only able to complete a partial extraction of the Phone's contents[,]" recovering "a portion of the images saved on the phone, a portion of the video saved on the phone, and then some background database information[.]" *Id.* n. 7. However, law enforcement was unable to "recover additional communications beyond the Signal messages that were photographed on March 17, 2023." *Id.*

### 3.    Additional Obstruction[2]

On September 23, 2024, after Defendant was arrested, he signed an affidavit containing false statements (the "Affidavit"). *Id.* ¶ 18. Specifically, in an affidavit filed with the Court in support of an opposition to a Government motion, Add. to PSR at 1, ECF No. 132, Defendant represented: "(a) the Phone rang incessantly when he was attempting to examine the related search warrant for the Phone; (b) while the agents were taking photographs of evidence on the Phone, they were 'taunt[ing the defendant], elbowing each other, pointing fingers at [him] and telling [him] that [he] was 'fucked'; and (c) that the defendant called his wife before slamming the Phone on the floor." PSR ¶ 18. These representations were "disproven via testimony from investigators and photographs of the Phone showing that it was in airplane mode after agents seized it." *Id.*

### B.  Procedural Background

On March 17, 2023, Defendant was released after law enforcement searched and seized the Phone at JFK. *Id.* ¶ 14. Five days later, on March 22, 2023, the Government filed a complaint against Defendant, alleging he "knowingly, intentionally and corruptly alter[ed], destroy[ed], mutilate[d] and conceal[ed] a record, document and other object, and attempt[ed] to do so . . . with the intent to impair the object's integrity and availability for use in an official proceeding, to wit: a proceeding before a federal grand jury in the Eastern District of New York." Compl. at 1, ECF No. 1. The same day, Magistrate Judge James R. Cho issued a warrant for Defendant's arrest. ECF No. 2.

Between March 22 and 23, 2023, law enforcement had difficulty locating Defendant because he had been moving between two different hotels rather than his residence or other

---

[2] Probation and the Government agree this conduct does not form the basis for an obstruction enhancement given Defendant's "false statements ultimately did not impede the instant investigation or prosecution of the instant offense" and the jury in Defendant's trial never viewed the Affidavit. Add. To PSR at 1, ECF No. 132.

addresses he frequented previously. PSR ¶ 15. On March 23, 2023, Westchester County police officers arrested Defendant in Yonkers, New York. Add. to PSR at 1, ECF No. 132. *Id.* Among other items recovered from a search of Defendant's property, law enforcement found a duffle bag which tested positive for cocaine residue. *Id.* He was then transported to a local police headquarters, and the FBI was informed of his arrest. *Id.* Defendant was transferred to federal custody on March 27, 2023. *Id.*

On March 27, 2023, Magistrate Judge Robert M. Levy arraigned Defendant on the complaint and entered a detention order without prejudice. Mar. 27, 2023 Min. Entry. On April 14, 2023, then-Magistrate Judge Ramon E. Reyes, Jr., held a bond hearing, granted bail in the amount of $500,000.00 with three sureties, and released Defendant to home confinement. *See generally* Order Setting Conditions of Release, ECF No. 9.

On April 24, 2023, a U.S. Grand Jury returned an indictment against Defendant (the "Indictment") which asserted one count for attempted obstruction of justice in violation of 18 U.S.C. § 1512(c)(1). Indictment ¶ 1, ECF No. 12. The Indictment also raised a criminal forfeiture allegation as to the sole count. *Id.* ¶¶ 2–3.

The parties proceeded to trial on October 15, 2024. From October 15 to 18, 2024, this Court held a jury trial on the sole count of the Indictment. On October 18, 2024, the unanimous jury found Defendant guilty of attempted obstruction of justice in violation of 18 U.S.C. § 1512(c)(1). Verdict Sheet at 1. Defendant was remanded into custody following the guilty verdict.

On December 2, 2024, Defendant moved for release on bond pending sentencing, which this Court denied on September 16, 2025. ECF Nos. 108, 123.

6

On February 2, 2026, the U.S. Probation Office ("Probation") filed the PSR. *See* PSR. The next day, the Court scheduled the sentencing hearing. On April 13, 2026, Defendant filed his sentencing memorandum. *See* Def. Sent'g Mem, ECF No. 129. On April 23, 2026, the Government filed its sentencing memorandum. *See* Gov't Sent'g Mem. Defendant filed supplements to his memorandum on April 24, 2026 and April 29, 2026. Def. Sent'g Mem. Supp., ECF No. 131; Def. Second Sent'g Mem. Supp., ECF No. 133. On April 28, 2024, Probation filed an addendum to the PSR. *See* Add. To PSR.

## II.    Legal Standard

Congress set forth the procedures for imposing a sentence in a criminal case in 18 U.S.C. § 3553. Together with 18 U.S.C. § 3553, the United States Federal Sentencing Guidelines (the "Sentencing Guidelines," or "Guidelines," or "U.S.S.G.") operate as the "starting point and . . . initial benchmark" for a court evaluating a criminal sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). If and when a trial court chooses to impose a sentence outside of the Sentencing Guidelines range, the court "shall state in open court the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The court must also "state[] with specificity" its reasons for so departing "in a statement of reasons form." *Id.* The court's statement of reasons "shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Davis*, 08-CR-332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.) (internal citation omitted).

When determining the appropriate sentence, the court must consider seven different factors: (1) the nature and circumstances of the offense and the history and characteristics of the

7

defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentence and the sentence range established by the Guidelines; (5) any pertinent policy statements issued by the United States Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense. *See* 18 U.S.C. § 3553(a). The Court now addresses each factor in turn.

## III.    Analysis

### A.    The Nature and Circumstances of the Offense and the History and Characteristics of Defendant

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

#### 1.    *Family and Personal Background*

Defendant was born on April 16, 1975, in New York, New York to the marital union of Julian Gonzalez, Sr., and Clara Gratereaux, immigrants from the Dominican Republic. PSR ¶ 40 n.10. Defendant's father was the family's sole provider, so Defendant was primarily raised by his mother. *Id.* ¶ 42.

Both his parents remained actively present throughout Defendant's life, supporting all his interests and endeavors. *Id.* Defendant "grew up in the church" as his parents raised him in a loving home with a Catholic upbringing. *Id.* Defendant denied experiencing any abuse or neglect during his childhood. *Id.* Instead, Defendant described a "good" childhood, in which his basic needs were always met. *Id.* Defendant recalled his mother received an unspecified amount of Supplemental Nutrition Assistant Program (SNAP) benefits when he was young. *Id.* However, Defendant was "never deprived of anything[.]" *Id.* He was an athlete and played baseball and football until high school. *Id.*

8

Defendant's parents currently reside in Washington Heights, New York. *Id.* ¶ 40. Defendant's father is a retired jeweler. *Id.* He suffers from type I diabetes, high blood pressure, and dementia, and uses a wheelchair due to age-related conditions. *Id.* His father began taking medication upon receiving his dementia diagnosis which was made prior to 2025. *Id.* Defendant's mother is a homemaker. *Id.* She suffers from type I diabetes, high blood pressure, obesity, and arthritis, and uses a walker. *Id.* Defendant's parents have two home health attendants who visit their residence every day for approximately eleven hours. *Id.*

 Defendant reported a "very close relationship[]" with his parents. *Id.* Prior to his incarceration, Defendant visited his parents four or five times per week. *Id.* He chose to live near his parents so he "could be there for them." *Id.* Since his incarceration, Defendant speaks to his parents one or twice per month. *Id.* Defendant's parents are aware of this case and remain supportive. *Id.*

Defendant has one sibling, Claribel Gonzalez, who is fifty-five years of age. *Id.* ¶ 41. She is unemployed, separated from her spouse, and has two adult children. *Id.* Defendant's sister suffers from an unknown gastrointestinal disease, which she manages through medication and a low-fat diet. *Id.* Defendant's sister also suffers from mental health conditions and schizophrenia. *Id.* Defendant reports a close relationship with his sister, however, he stated it "could be a better" one. *Id.* Prior to his incarceration, Defendant spoke to his sister once per month, although his parents kept him updated on her condition. *Id.* While incarcerated, Defendant speaks with his sister twice per month. *Id.* Defendant's sister is aware of this case and remains supportive. *Id.*

On October 2, 2022, Defendant married Jessica Londono, whom he began seeing in 2015. *Id.* ¶ 43. *Id.* Ms. Londono is thirty-five years of age and resides in Queens, New York.

9

*Id.* She works as a sales representative for an international company and enjoys good health. *Id.* Neither Defendant nor Ms. Londono have any children. *Id.* ¶¶ 43–44. Defendant and Ms. Londono share a good relationship and they speak daily. *Id.* ¶ 43. She described Defendant as a good person with a "beautiful heart." *Id.* ¶ 49. Ms. Londono stated Defendant always looks out for his parents and has "so many good qualities." *Id.* Ms. Londono is aware of this case and remains supportive. *Id.* ¶ 43. She stated people at trial "lied over and over again" and "thinks a lot of [the] things that were said [at the trial] were untrue." *Id.* ¶ 49.

Defendant is a life-long New York state resident. *Id.* ¶ 45. Until 1995, Defendant resided in Washington Heights. *Id.* From 1995 to approximately 1997, Defendant lived in Santo Domingo, Dominican Republic. *Id.* He reported returning to Washington Heights after "times got rough" due to economic inflation. *Id.* From 1999 to 2001, Defendant lived in the Bronx, New York, until he was federally incarcerated for a prior conviction in the Eastern District of Pennsylvania. *Id.* Defendant remained in federal custody until 2009, when he was released. *Id.* Thereafter, Defendant lived in Washington Heights until 2012 or 2013, when he relocated to the Bronx and lived there until 2015. *Id.* In 2015, Defendant moved with his wife to Yonkers, New York, where he remained until his arrest. *Id.*

In addition to the above, the Court has considered the letters of support Defendant's friends and family have submitted on his behalf. *See generally* Def. Sent'g Mem., Exs.; Def. Suppl. Exs., ECF No. 131-1.

### 2. *Educational and Employment History*

During an unspecified time period, Defendant reported attending The Mott Hall School for the Gifted and Talented Middle School in New York, New York. *Id.* ¶ 61. Records indicate Defendant attended—and received his high school diploma from—Cardinal Hayes High School

in the Bronx, New York, from September 1989 to June 1994. *Id.* ¶ 61. Other than these two institutions, Defendant also reported attending the High School of Art & Design in New York, New York from 1989 to 1990; records indicate Defendant's discharge from the school in October 1990. *Id.*

From August 1993 to May 1994, Defendant attended Stony Brook University in Stony Brook, New York. *Id.* He did not continue his academic career there because he was "kicked out" for "partying too much and . . . not academically succeeding." *Id.*

In terms of Defendant's skillset, he gained video/media editing skills through both courses and personal experience. *Id.* ¶ 63. Defendant received his Commercial Driver's License in 2018 after completing the required 35-hour training course at the Ferrari Driving School in the Bronx. *Id.* His license remains active. *Id.* At the Metropolitan Detention Center, Brooklyn (the "MDC"), Defendant takes a Visualizing History: Photography in Conflicts and Crisis course through Columbia University. *Id.* He has participated in numerous other courses. *See id.* ¶ 47. A record search noted Defendant previously applied for a New York City Taxi and Limousine Commission taxi license in October 2009. *Id.* ¶ 48.

Defendant has an extensive and varied employment record. He has worked as a security guard, salesman, part-time florist, event planner, truck driver, delivery driver, loan officer, personal trainer, cab driver, and international phone call operator. *See id.* ¶¶ 65–71. Defendant has owned and operated different business, the most significant being a transportation and logistics trucking company named Knights Templar Logistics, LLC (the "Business"). *Id.* ¶ 66. The Business was ultimately registered in Texas after being initially registered in New Jersey. *Id.* The Business was diverse, covering garbage pick-ups, produce pick-ups, sand hauling, and Amazon deliveries. *See id.*

Defendant is still the sole owner of the Business and had between five and seven employees working for him prior to his incarceration for the instant offense. *Id.* In total, the Business owned five trucks, *id.*, which Defendant later sold alongside other assets due to financial problems stemming from his current incarceration, *id.* ¶¶ 49, 67 (noting sale of assets valued between $210,000.00 and $220,000.00). Defendant reported the Business earned an average of $500,000.00 per year, netting Defendant a salary of $180,000.00. *Id.* ¶ 66. Although the Business is active, it does not earn income, its business accounts are closed, there are no employees, and it is no longer operational. *Id.*

While in custody at the MDC, Defendant has worked as a Suicide Watch Companion and Suicide Watch Orderly. Def. Sent'g Mem. at 1.

After considering Defendant's assets and liabilities, Probation concluded Defendant appears unable to pay a fine. *Id.* ¶ 76.

3.    *Prior Convictions*

Defendant has one prior conviction for: (1) conspiracy to distribute cocaine; (2) illegal use of a communications facility; (3) aiding and abetting the distribution of cocaine; and (4) possession with intent to distribute cocaine. *Id.* ¶ 32. Between June 2000 and July 2001, Defendant participated in a drug conspiracy in which he "traveled from New York to Philadelphia, Pennsylvania, to deliver kilograms of cocaine to one of his co-defendants and pick up related payments." *Id.*

On September 17, 2001, Defendant was arrested for this offense at twenty-six years of age. *Id.* On December 12, 2002, the U.S. District Court for the Eastern District of Pennsylvania sentenced Defendant to 110 months of incarceration, five years of supervised release, and a

$3,000.00 fine. *Id.* Defendant commenced supervised release on September 29, 2008, which expired on January 26, 2015. *Id.*

### 4.    *Physical and Mental Health*

In April 2025, Defendant reported worsening eyesight, despite wearing glasses. *Id.* ¶ 52. Records note he also suffers from peripheral neuropathy—damage or disease affecting the nerves—in his hands and feet. *Id.* Defendant has also been diagnosed with primary osteoarthritis in his knees and chronic periodontitis. *Id.*

Due to Defendant's medical conditions, he has complained of tingling and numbness in his extremities, pain and tenderness in his knees, and toothaches. *See id.* Defendant takes medications purchased through the MDC's commissary and has been advised to "participate in regular low-impact physical activity, such as walking . . . use [of] a warm compress to alleviate stiffness[,] [and] [to] elevate and rest during periods of increased pain or swelling." *Id.*

Defendant reported no history of mental or emotional health conditions, nor related treatments, suicidal ideation, or a history of excessive gambling. *Id.* ¶ 53.

### 5.    *Substance Abuse*

Defendant first consumed alcohol at twenty-three years of age. *Id.* ¶ 55. He drinks wine with food or while smoking cigars, although his preferred alcoholic beverage is dark liquor. *Id.* Defendant denied alcohol abuse despite reporting he consumed alcohol every day prior to October 2024. *Id.*

Defendant engaged recreationally both with marijuana—approximately three times a week—and ecstasy—approximately once a week—throughout the year 2000. *Id.* ¶¶ 56–57. Defendant reported stopping his marijuana usage because "it wasn't his thing." *Id.* Defendant

13

stopped using ecstasy due to his first federal incarceration stemming from his conviction in Pennsylvania. *See id.* ¶ 57.

Defendant also used powder cocaine approximately once per week in 1999 or 2000. *Id.* ¶ 58. Defendant reported stopping his cocaine usage in 2000 because "it was not his thing." *Id.*

Defendant participated in the Bureau of Prisons' Residential Drug Abuse Program around 2007 while incarcerated in Pennsylvania. *Id.* ¶ 59. He completed the program successfully after dedicating 500 hours. *Id.* In 2009, Defendant also underwent substance abuse treatment at a facility in New York, New York, where he attended sessions once per week until completing the program in 2010. *Id.*

      6.    *Nature and Circumstances of the Offense*

The Court's previous statements address the nature and circumstances surrounding the instant offense. *See supra* Part I.

**B.    The Need for the Sentence Imposed**

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

The Court's sentence recognizes the seriousness of Defendant's conduct. Defendant, in an attempt to obstruct an FBI investigation, intentionally caused significant damage to his Phone which contained evidence of cocaine distribution and a conspiracy to distribute cocaine. *See* PSR ¶¶ 12–14. The Court's sentence will deter Defendant and others from engaging in similar

conduct, justly punish Defendant for his crimes, and protect the public from Defendant's actions. Accordingly, the Court's sentence is "sufficient, but not greater than necessary" to comply with the purposes set forth in this factor. 18 U.S.C. § 3553(a).

### C. The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3). Defendant was found guilty of one count of attempted obstruction of justice in violation of 18 U.S.C. § 1512(c)(1). Verdict Sheet at 1.

Defendant faces a maximum term of twenty (20) years of incarceration. 18 U.S.C. 1512(c)(1). Defendant also faces a maximum term of three (3) years of supervised release. 18 U.S.C. 3583(b)(2). If a condition of release is violated, Defendant may be sentenced to up to two (2) years of incarceration without credit for pre-release incarceration or time previously served on post-release supervision. 18 U.S.C. § 3583(e). Defendant is eligible for a minimum term of probation of one (1) year and a maximum term of five (5) years. 18 U.S.C. § 3561(c)(1). Unless extraordinary circumstances exist, the Court must impose one of the following as a condition of probation: a fine, restitution, or period of community service. 18 U.S.C. § 3563(a)(2).

In addition to facing a term of incarceration and supervised release, Defendant faces a maximum fine of $250,000.00. 18 U.S.C. 3571(b). The Court is also required to impose a mandatory special assessment of $100.00 pursuant to 18 U.S.C. § 3013(a)(2)(A).

### D. The Kinds of Sentence and the Sentencing Range Established for Defendant's Offense

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . [t]he applicable category of offense committed by the applicable category of defendant as set forth in the guidelines." *Id.* § 3553(a)(4)(A).

The parties agree no enhancements or reductions apply in this case. *See generally* PSR; Gov't Sent'g Mem; Def. Sent'g Mem. The parties further agree Defendant's Criminal History Category is II because of a prior conviction for conspiracy to distribute cocaine, illegal use of a communications facility, distribution of cocaine, aiding and abetting, and possession with intent to distribute cocaine. PSR ¶¶ 32, 34; Gov't Sent'g Mem. at 6 (noting a Criminal History Category of II applies); Def. Sent'g Mem. at 3 (same).

The only dispute with respect to the Guidelines calculation is whether a cross reference at U.S.S.G. § 2J1.2(c)(1) applies.

The parties all agree the appropriate starting Guideline provision is U.S.S.G. § 2J1.2 which covers obstruction of justice. *See* U.S.S.G. § 2J1.2; PSR ¶ 22; Gov't Sent'g Mem. at 6–7 (relying on cross-reference in U.S.S.G. § 2J1.2); Def. Sent'g Mem. at 3.

However, the parties disagree as to whether the cross reference at U.S.S.G. § 2J1.2(c)(1) applies in this case. Specifically, Probation and the Government agree the cross reference applies because Defendant's "offense involved obstructing the investigation or prosecution of a criminal offense," whereas Defendant argues it does not apply because the Government "did not attempt to prove, by even a preponderance of the evidence, that any underlying crime actually occurred."[3] PSR ¶ 22 (applying cross reference); Gov't Sent'g Mem. at 6–7 (same); Def. Sent'g Mem. at 3–4.

---

[3] The Court notes Defendant's failure to submit timely these objections to the PSR under Federal Rule of Criminal Procedure 32(f). The Court would be well within its discretion to disregard Defendant's objections as a result. *United States v. Young*, 140 F.3d 453, 457 (2d Cir. 1998). Notwithstanding Defendant's failure, the Court has considered Defendant's objections and rejects them as being without merit.

16

Applying the cross reference, Probation and the Government calculate a Base Offense Level of 24. PSR ¶ 22; Gov't Sent'g Mem. at 6. Disregarding the cross reference, Defendant calculates a Base Offense Level of 14 pursuant to U.S.S.G. § 2J1.2(a). Def. Sent'g Mem. at 3.

Because the parties disagree on the applicable Base Offense Level, their calculations of the applicable Guidelines range differ. Probation and the Government agree, pursuant to the Guidelines Sentencing Table, a Total Adjusted Offense Level of 24 and a Criminal History Category of II results in a Guidelines range of fifty-seven (57) to seventy-one (71) months' incarceration. U.S.S.G. § 5A; PSR ¶ 30; Gov't Sent'g Mem. at 6. Defendant calculates a Total Adjusted Offense Level of 14 which, with a Criminal History Category of II, results in a Guidelines range of eighteen (18) to twenty-four (24) months' incarceration. U.S.S.G. § 5A; Def. Sent'g Mem. at 3.

The Court appreciates the sentencing arguments raised by all parties and has seriously considered each in turn.

### E.    Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(5). Defense counsel has directed the Court's attention to now-repealed U.S.S.G. § 5H1.4. *See* Def. Sent'g Mem. at 10. U.S.S.G. § 5H1.1, which was removed effective November 1, 2025, provided as follows in pertinent part:

> Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

Although repealed, the U.S. Sentencing Commission mentioned the removal of U.S.S.G. § 5H1.4—along with the removal of other departures and policy statements for specific personal characteristics—"does not limit the information courts may consider in imposing a sentence nor does it reflect a view from the Commission that such facts should no longer inform a court for purposes of determining the appropriate sentence." U.S.S.G Ch.1, Pt. A, intro. comment. The U.S. Sentencing Commission has further explained it "envisioned and framed [the] 2025 amendment to be outcome neutral, intending that judges who would have relied upon facts previously identified as a basis for a departure would continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range as a variance under 18 U.S.C. § 3553(a)." *Id.*

The Court acknowledges U.S.S.G. § 5H1.4 and considers its underlying rationale and policy. The parties have not drawn the Court's attention to any other applicable policy statements. Finding no others on its own, the Court proceeds to the next § 3553(a) factor.

### F.    The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

The parties have not raised any arguments about unwarranted sentencing disparities in this case. For the reasons stated in this Memorandum and Order, and considering the other six § 3553(a) factors, the Court's sentence avoids unwarranted sentence disparities.

### G.    The Need to Provide Restitution

Finally, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). Restitution is not applicable in this case. 18 U.S.C. § 3663.

### IV.    Conclusion

For the reasons set forth above, the Court sentences Defendant to fifty-seven (57) months' incarceration; two (2) years of supervised release with both the standard conditions and special condition of supervision; and a $100.00 mandatory special assessment. This sentence is sufficient, but not greater than necessary to accomplish the purposes of § 3553(a)(2). The Court does not impose a fine given Defendant's present financial circumstances.

The Court expressly adopts the factual findings of the PSR and addenda thereto, as corrected herein, to the extent those findings are not inconsistent with this opinion. The Court advises Defendant he has fourteen (14) days to appeal the order and judgment of this court from the date the order and judgment are entered.

SO ORDERED.

**s/WFK**

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: May 1, 2026
        Brooklyn, New York

19